CHERRY *v.* LOFFLER, Personal Representative of the
Estate of Raymond E. Kuenne

[No. 363, September Term, 1971.]

*Decided June 7, 1972.*

The cause was argued before HAMMOND, C. J., ▊ and
BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ., and
RICHARD P. GILBERT, Associate Judge of the Court of
Special Appeals, specially assigned.

James L. Cherry, in proper person.

*Thomas C. Hayden, Jr.,* with whom was *H. A. Turner,
IV* on the brief, for appellee.

McWilliams, J., delivered the opinion of the Court.

This appeal has to do with the efforts of the appellant (Cherry), appearing *pro se* both here and below, to obtain the specific enforcement of a 1964 contract for the sale of land and the rescission of a later contract for the sale of the same land which, at first, he sought to have enforced. The chancellor, Bowie, J., was persuaded otherwise. We shall try to recount the facts and circumstances of this curious case in the order in which they seem to have happened.

On 19 August 1964 Raymond Kuenne agreed to sell to Bernard Appelbaum a parcel of land in Prince George's County containing about 40 acres. The $10,000 deposit was to be applied to a purchase price of $22,000 per acre. The contract was contingent upon the future availability of sewerage and water mains and the procurement of a change in the zoning classification. Settlement was to be made within 90 days after the final approval of the zoning reclassification at the office of Wheeler, Moore and Korpeck (WMK), a Montgomery County law firm. The contract provided also that time was of the essence and that the entire deposit would be held, until settlement, by WMK. Two brokers (Taylor and Byrd) were recognized as Kuenne's agents.

Within the week following the execution of the contract someone representing Byrd delivered to WMK a check for $10,000 signed by Appelbaum. It seems also that Reuben Schwartz, who said Appelbaum was merely a straw party "fronting" for him (Schwartz), instructed WMK "not to process * * * [the] case for settlement" and not to deposit the $10,000 check until he notified them to do so. On 26 August WMK sent the check to Schwartz, at the same time advising him of their unwillingness to handle the matter in accordance with those instructions. A copy of WMK's letter to Schwartz was sent to Byrd. What Schwartz did with Appelbaum's check the record does not disclose.

In December 1967 Taylor visited James C. Mitchell,

Esq., Kuenne's attorney, and expressed concern about the $10,000 deposit. He asked Mitchell "to check and make sure that the deposit had been made." Mitchell wrote to WMK on 13 December asking them to verify the presence of the deposit in their escrow account. WMK asked for a copy of the contract; Mitchell sent them a copy on 3 January 1968. A few weeks later WMK sent a letter to Mitchell stating they did not have any money, that they had never been asked to investigate the title and that they had not been employed to deal with a zoning reclassification.

Mitchell's efforts to communicate with Appelbaum were successful only in stirring up Schwartz who visited him (Mitchell) on 5 February. Schwartz insisted the deposit had been made. On 14 February Mitchell sent the following letter to Schwartz, copies of which were sent also to Appelbaum, WMK and Taylor:

> "When you were in my office on February 5 it was my understanding that you would promptly contact the firm of Wheeler, Moore & Korpeck, Attorneys, and furnish me with evidence that the $10,000 deposit called for under Mr. Kuenne's contract with Mr. Bernard Appelbaum has been deposited with that law firm in escrow.
>
> "I have tried to contact you by phone on several occasions without success. Today I talked with Mr. Korpeck who advises me that he still does not have the $10,000 deposit. Unless this deposit is made before the end of this week [17 February], I will consider the contract between Mr. Kuenne and Mr. Appelbaum as being in default for lack of compliance with the requirement for the $10,000 deposit by Mr. Appelbaum and I will proceed to file a suit to have the contract declared null and void."

On 20 February WMK wrote to Mitchell telling him they had seen nothing of Schwartz nor had anyone de-

posited $10,000 with them. On 26 February Appelbaum assigned all of his "right and interest" in the contract to Schwartz. This assignment was neither recorded nor made known to anyone at the time. On 29 February Mitchell wrote to Schwartz as follows:

"Mr. Taylor advised me by telephone yesterday afternoon of his conversation with you about the possibility of a new contract on the Kuenne property. According to Mr. Taylor, you would like to have in writing the changes Mr. Kuenne would like if it is to be a new contract.

"First, let me point out that any new contract is contingent upon Mr. Bernard Appelbaum relinquishing any rights he might have under the prior contract which Mr. Kuenne accepted as of August 19, 1964. It is questionable whether any such rights do exist because, as you know, I have been advised by the Law Firm of Wheeler and Korpeck, formerly Wheeler, Moore and Korpeck, that the $10,000 deposit which Mr. Appelbaum was required to make with them is not in their hands. However, before any new contract is entered into there would have to be an adjudication that no contract exists or a cancellation by mutual agreement between Mr. Kuenne and Mr. Appelbaum.

"If there is to be a new contract Mr. Kuenne will insist on these provisions being incorporated:

"1. The old contract was contingent 'upon sewer being available to the property and the purchaser being able to procure rezoning of the property for RH; R-10; R-18; or C-2 classification.'

"Since the rezoning has been accomplished that contingency would be omitted. The sewer being available contingency would be changed so as to require settlement within sixty days after

sewer line has been installed either along Bright-seat Road or the Beltway adjacent to the property or to the Brightseat High School. In any event, however, settlement would not be later than twenty-four months from date of new contract.

"The Washington Suburban Sanitary Commission advises me that application is on file for extension of the sewer line to Brightseat High School.

"2. The purchaser under new contract would be required to make application to W.S.S.C. within thirty days after new contract for extension of sewer lines to serve the property.

"If you are interested in trying to work out a new contract along these lines, I will expect to hear from you within ten days, otherwise the proposals set forth in this letter will expire."

Copies were sent to Appelbaum, Byrd, Taylor and Kuenne.

On 11 March WMK again wrote to Mitchell advising him they had seen neither Schwartz nor the $10,000.

Mitchell prepared a new contract incorporating the changes mentioned in his letter of 29 February. On 18 April Appelbaum and Schwartz came to Mitchell's office. He said he knew both of them had been there because he had "insisted that before * * * [he] would let Mr. Kuenne sign any new contract * * * [he] would have to see Appelbaum in person and make sure that he released his rights under the old contract." Had he known of the assignment, he said, he would have had Schwartz sign as well. The text of the release follows:

"The parties to the aforegoing contract of sale do by mutual agreement hereby cancel said contract in its entirety and each of said parties releases the other from performance, obligation or liability under said contract. And the Purchaser

> acknowledges return and receipt of the Ten Thousand ($10,000) deposit called for under the contract."

Taylor and Byrd signed separate releases of their interest in the contract. Mitchell said no money changed hands. He added the last sentence of the release, he said, "simply because that contract said the deposit had been made."

Kuenne and Schwartz signed the new contract and Schwartz handed over a certified check for $10,000. Some time thereafter James S. Gardiner, Esq., became Schwartz's attorney. In September 1969 he wrote to Mitchell telling him that the water line had been completed but that it was unlikely the sewer line would be finished before 18 April 1970. Nevertheless, he went on, Schwartz "plans to make settlement" before then.

On 31 December 1969 Mitchell became an Associate Judge of the Seventh Judicial Circuit. Thomas C. Hayden, Jr., Esq., who thereupon undertook the representation of Kuenne, wrote to Gardiner on 25 February 1970 reminding him that "settlement must be held on the contract by April 18 * * * ." A copy was sent to Schwartz. On 1 March 1970 Schwartz assigned all of his "rights, title and interest in and to" the 1968 contract to Cherry "in consideration of $10,000 and other valuable considerations paid by" Cherry. Hayden wrote to Schwartz on 20 March sending copies to Gardiner, Kuenne, Byrd and Taylor. The text of his letter follows:

> "I have discussed the above matter with James S. Gardiner, Esquire, by telephone on two occasions since my letter of February 25, 1970.
>
> "Mr. Gardiner advises me that he no longer represents you in view of his new position. Further, Mr. Gardiner advises me that he has discussed this matter with you and that you have indicated to him that you fully intend to make settlement as required by the Contract on or before April 17, 1970.
>
> "In view of the fact that the contract deadline

is rapidly approaching, I suggest that we must take rapid steps to have this matter prepared for settlement.

"Please forward me a copy of the survey in order that Mr. Kuenne and I might review it. Also, I suggest that all settlement papers should be prepared in sufficient time prior to the actual settlement to allow us to review them.

"I notice that the Contract calls for settlement in our office or the title company. Mr. Kuenne has requested that the settlement be held in our office.

"Please have your attorney contact me promptly in order that proper arrangements can be made."

On 6 April Hayden wrote once more to Schwartz confirming a telephone conversation "during which it was agreed that settlement * * * would take place on Friday, April 17, 1970 at 1:30 p.m." in Hayden's office. Copies were sent to Taylor, Byrd and the appellee, Mrs. Loffler. Kuenne died on 29 March.

Hayden said Swartz telephoned him several times requesting an extension of the settlement date. Hayden told him "the estate would listen to an offer" but that the only thing Schwartz would say was "we want an extension." Hayden knew nothing of the assignment and he said he never heard of Cherry until he (Cherry) filed suit in late April.

Hayden got his people together on 17 April at the appointed time. He testified "the estate was ready, willing and able to settle under the contract." Schwartz and a Mr. McFadden appeared and presented two extension agreements, one for 30 days and one for 60 days. Hayden told them he had been instructed to say that the estate would not agree to an extension unless additional consideration was offered and court approval could be obtained. Schwartz and McFadden left. The settlement did not take place. Schwartz later admitted he was never

at any time before or after April 1970 "willing, ready and able to go through with the contract of 1968." That, he said, is why he assigned it to Cherry. He said he came to the settlement on 17 April in behalf of Cherry but he could not say Cherry was ready, willing and able to complete the settlement. He came to the settlement "to get an extension, that's all." Pressed by Judge Bowie, at the hearing, he said he received no money from Cherry but that he had "10 percent of the whole deal." Later on he said he was holding Cherry's check for $10,000 in a safe deposit box. He said he might cash it in the future but under what circumstances he did not say. Cherry's comment in this regard failed of enlightenment.

On 27 April Hayden wrote to Schwartz, sending copies to Taylor and Byrd. The text of his letter follows:

"As you are aware, this office represents Margaret Loffler, Administratrix of the Estate of Raymond E. Kuenne.

"Under the terms of your Contract with Mr. Kuenne for the purchase of his Prince Georges County property settlement was due to be held not later than twenty-four months after the date of the Contract, April 18, 1968.

"In view of the fact that settlement has not taken place in accordance with the terms of the Contract, you are hereby notified that Mrs. Loffler, as the personal representative of Raymond E. Kuenne, hereby exercises the Estate's option and declares the $10,000.00 cash deposit forfeited and the Contract null and void."

Cherry filed his bill of complaint on 29 April and an incredible mish-mash it is. He recited the assignment and he alleged that "in all respects [he had] carried out his part of the contract and * * * done and performed all matters and things therein contained by him to be done." In his prayer for relief he demanded specific performance, the "release of the land," an accounting and possession. The appellee responded with a counterclaim praying a

declaration of nullity in respect of the 1968 contract and the forfeiture of the deposit. In December Cherry filed a "supplemental complaint" alleging that Schwartz had been cajoled into signing the 1968 contract by fraudulent misrepresentations. He demanded its rescission and the reinstatement of the 1964 contract. In June of 1971 he filed an amendment to the supplemental complaint in which he recited the assignment to him by Schwartz, on 11 January 1971, of the 1964 contract. He repeated his demand for the rescission of the 1968 contract and prayed that the 1964 contract "be allowed to prevail."

At the hearing before Judge Bowie on 22 October 1971 Cherry offered in evidence the three assignments, the two contracts, WMK's receipt for $10,000 dated 25 August 1964, Judge Mitchell's letter of 14 February 1968 and the testimony of Schwartz and himself. The appellee's position was developed by the correspondence and the testimony of Judge Mitchell, Hayden, the appellee's son, and Taylor.

Judge Bowie, in his oral opinion, made findings of fact, the more significant of which are:

1. No misrepresentations were made in respect of the cancellation of the 1964 contract and the signing of the 1968 contract.
2. The 1964 contract became null and void on 17 February 1968, nine days before Appelbaum assigned it to Schwartz. Judge Bowie explained that Mitchell's letter of 14 February, sent to both Schwartz and Appelbaum, gave them until "the end of this week" (17 February) to deposit the $10,000 and in default of which he would consider the contract to be null and void.
3. If there is any doubt about finding No. 2 the cancellation of 18 April 1968 surely nullified the 1964 contract.
4. Schwartz (and Cherry) were in default in respect of the 1968 contract.

The decree, filed 3 November 1971, declared both contracts to be null and void and ordered the forfeiture of the deposit.

The several cases cited by Cherry have no discernible relation to the facts of this case and his arguments must be rejected as lacking merit. We are satisfied that Judge Bowie's findings of fact are not clearly erroneous, Maryland Rule 886, and there is no indication that he has misapplied the applicable law. Indeed, the applicable law is so well known and so firmly established that any discussion of it would be hauling timber into the woods.[1]

For obvious reasons we do not reach the motion to dismiss but it should not be supposed we would have denied it had we gotten that far.

*Decree affirmed.*
*Costs to be paid by the appellant.*

---

1. Horace, *Satires*, bk. I (35 B.C.), satire x, 34.